## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DARRELL TRISTAN ANDERSON,       )
                                )
                Plaintiff,      )
                                )
        v.                      )       1:19cv1195
                                )
SGT. N. KEEGAN, et al.,         )
                                )
                Defendants.     )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on "Defendants' Motion for Summary Judgment" (Docket Entry 42) (the "Motion") filed by Nicholas Keegan (at times, "Sgt. Keegan") and Katelyn McConnell (at times, "Officer McConnell"). For the reasons that follow, the Court should grant in part and deny in part the Motion.

## BACKGROUND

Alleging violations of his constitutional rights arising from an incident on February 8, 2018, during his incarceration at Albemarle Correctional Institution ("Albemarle"), Plaintiff filed suit against Sgt. Keegan, Officer McConnell (collectively, the "Defendants"), and various other North Carolina Department of Public Safety (the "NCDPS") employees. (See Docket Entry 2 (the "Complaint") at 1-41.)[1] Reviewing the Complaint pursuant to 28

---

[1] Docket Entry page citations utilize the CM/ECF footer's pagination.

U.S.C. § 1915A (see generally Docket Entry 3), the Court permitted Plaintiff to pursue his "excessive force claims under 42 U.S.C. § 1983 against Defendants" (Docket Entry 7 at 1) but dismissed all other claims in the Complaint. (See id. (adopting Docket Entry 3).)

The parties thereafter engaged in discovery (see, e.g., Docket Entry 48-3 (Defendants' responses to Plaintiff's requests for production and admissions)), after which Plaintiff filed the "Declaration of Plaintiff Darrell T. Anderson-Bey" (Docket Entry 41 (the "Declaration") at 1). In addition to submitting the Declaration under "penalty of perjury" (id. at 8), Plaintiff "also declare[d] and verifie[d]" under "the penalty of perjury" the allegations in the Complaint (id. at 7). A week later, Defendants filed the Motion. (See Docket Entry 42.) Defendants' Motion and their supporting materials do not address the Declaration (and only note that Plaintiff "alleges" certain facts in his Complaint (e.g., Docket Entry 44, ¶¶ 1-5)). (See Docket Entries 42-46.) Plaintiff responded to the Motion by filing multiple exhibits, affidavits, and memoranda, many of which he verified under penalty of perjury (see, e.g., Docket Entry 48 at 14). (See Docket Entries 48 to 48-14, 51-52, 55-57.) Defendants did not file a reply in support of the Motion. (See Docket Entries dated Sept. 15, 2021, to present.)

As relevant here, Plaintiff's summary judgment evidence reflects:

On February 4, 2018, Officer Dennis ordered Plaintiff to move a chair from the top tier sleeping bunk area, but Plaintiff refused to comply on the grounds that Officer Dennis's order "'[wa]s not within reason, because [Plaintiff] did not place the chair up there.'" (Docket Entry 2 at 19.) Although Officer Dennis asserted that his "order was within reason," Plaintiff disagreed and offered as "an example [of an unreasonable order], 'If you were to awake[n] me only to ask me to move a chair, I would not do it because it would be disrespectful, and not within reason, because you could have gotten anyone to move the chair.'" (Id. at 20.)

Around 8:50 a.m. on February 8, 2018, "Plaintiff was awaken[ed] from his sleep, by an order given over the intercom of [D dorm in the Badin Unit]" ordering Plaintiff "to report to the Officer's Station." (Id. at 18.) When Plaintiff arrived at the Officer's Station moments later, he found Defendants waiting for him. (Id.) Upon Plaintiff's arrival, Sgt. Keegan "asked, 'Is this him?'" (Id.) Upon "confirm[ing] his target, [Sgt. Keegan] glared at Plaintiff[] and hostilely ordered, 'Go back in there and move that chair, that's by your bunk, to the bottom sleeping quarters!'" (Id.) "Plaintiff asked if he had been awaken[ed] out of his sleep only to be ordered to move a chair." (Id.) "After it was confirmed that such was the fact, Plaintiff replied, 'I did not place the chair in its current location, so it[']s not my responsibility to move the chair.'" (Id. at 19.) "Plaintiff also

3

pointed out that dorm janitors are paid wages for duties which
consist of cleaning the sleeping quarter(s)." (<u>Id.</u>)  Sgt. "Keegan
then hostilely replied, 'I don't care who placed the chair up
there, I'm giving you a direct order to move it!'" (<u>Id.</u>)  At that
point, Plaintiff recalled his prior interaction with Officer Dennis
(<u>see id.</u>), whom he noticed "in the Control Booth" (<u>id.</u> at 20).

Plaintiff argued with Sgt. "Keegan for a few more seconds"
before "flee[ing Sgt.] Keegan's presence." (<u>Id.</u> at 21.)  When he
"arrived at the chair, furious that [Sgt.] Keegan had by-passed
dorm janitors and others, who[] were active in the dayroom area of
the dorm, to antagonize and target Plaintiff, by awak[en]ing
Plaintiff from sleep, to order Plaintiff to move the chair,"
Plaintiff dropped the chair from the top to the bottom sleeping
tier. (<u>Id.</u>)  However, Plaintiff first surveyed the bottom floor
"to be sure no one was in harm's way" before he dropped the chair,
and he "did not throw the chair from the top sleeping quarters as
later falsely reported." (<u>Id.</u> (internal quotation marks omitted).)
"Plaintiff then walked back down stairs," where Sgt. Keegan met him
"near the middle of the dayroom/dorm." (<u>Id.</u> at 22.)  Sgt. "Keegan
held a pair of handcuffs in his hand," but "did not tell Plaintiff
to submit to restraints." (<u>Id.</u>)  "[I]nstead he told Plaintiff, 'I
hope you refuse to cuff up so I can make you!'" (<u>Id.</u>)  "Plaintiff
asked, 'is that an order or a challenge?'" (<u>Id.</u>)  Plaintiff then

4

attempted to walk past Sgt. Keegan, but Sgt. "Keegan grabbed Plaintiff's arm, and pushed it." (Id.)

"Plaintiff had no time to respond, [as Sgt.] Keegan immediately followed his own action, by placing the palm of his hand(s) around [] Plaintiff's throat, and aggressively and maliciously slammed Plaintiff into a nearby wall." (Id.) "It then felt as if [Sgt.] Keegan was attempting to bang Plaintiff's head into the wall." (Id.; see also Docket Entry 55 at 7 ("[Sgt.] Keegan placed his hand(s)/palm(s) on, against, or around Plaintiff's throat/wind pipe area for purposes of applying pressure/force[] to ram/rush Plaintiff into the nearby wall").) After Sgt. Keegan "applied pressure/force to Plaintiff's throat/windpipe area, [he] then grabbed the back of Plaintiff's neck[] and beg[a]n to back-peddle, while pulling downward on the back of Plaintiff's neck, which would have achieved a goal of smashing Plaintiff's face into the hard concrete floor[.]" (Docket Entry 41 at 2.) "However, Plaintiff struggled, and did succeed to maintain balance (i.e. to remain on his feet), in [an] effort of preventing facial injury." (Id.) Sgt. "Keegan had clearly pulled Plaintiff (by Plaintiff's neck) from one side of the dorm half way to the other side of the dorm." (Id.) "Still Plaintiff had shown no signs of an assault or attempted assault on [Sgt.] Keegan." (Docket Entry 2 at 23.) Plaintiff mentally "searched for answers to minimize the excessive attack/assault." (Id.) "Plaintiff had

5

been turn[ed] sideways during the incident, but" then turned to face Sgt. Keegan. (Id.) "Plaintiff was rewarded with a malicious punch to the mouth[] by [Sgt.] Keegan." (Id.; see also Docket Entry 48-1 at 3 ("[Sgt.] Keegan punished Plaintiff with a closed right handed fist to Plaintiff's mouth, leaving swelling and bruising.").)

"At this point, Plaintiff was certain that he had only himself for his own protection, and [he] did put forth an effort to get [Sgt.] Keegan to cease the excessive, malicious, wanton attack/assault," by throwing one punch towards Sgt. "Keegan's jaw area." (Docket Entry 2 at 23-24.) "Plaintiff's 'counter-action' did cause [Sgt.] Keegan to abandon his attack/assault." (Id. at 24.) Officer McConnell "had watched the entire incident from the entrance of the dorm." (Id.) However, she failed to either call a Code Seven (per "procedure when staff is under attack")[2] or to "intervene[] to preserve/provide security to Plaintiff, while Plaintiff was under attack, but she did intervene[] when Plaintiff threw a punch to defend himself." (Id.) Specifically, Officer "McConnell stepped in and" struck "Plaintiff's leg[] with a baton[]

---

2 Officer McConnell admitted that she never called for backup regarding the incident and never called a Code Seven. (See Docket Entry 48-3 at 9-10.) Sgt. Keegan also admitted that he "never called for backup (never called a Code 7)" during the incident. (Id. at 16.)

6

while yelling, 'stop!'" (Id.)[3] Officer McConnell "did not hit Plaintiff hard at all [and] Plaintiff was not immobilized from the strike." (Docket Entry 55 at 13.) Instead, Plaintiff "spun around to glare at [Officer] McConnell, and upon" recognizing her as a female officer, "Plaintiff did turn back around and place[] his face up against the nearby wall to show that" Plaintiff did not intend any harm and remained willing "to be restrained, even though Plaintiff had never 'actually' been ordered to submit to hand cuffs." (Docket Entry 41 at 3.)

In turn, Sgt. Keegan avers:

Sgt. Keegan has worked for the NCDPS since 2010, serving as a Correctional Sergeant III at Albemarle on the date in question. (Docket Entry 45-5, ¶¶ 2-3.) At approximately 8:50 a.m. on February 8, 2018, Sgt. Keegan "gave a verbal directive to [Plaintiff] to move a chair away from his bunk." (Id., ¶ 5.) "[Plaintiff] grabbed the chair and threw it downstairs." (Id., ¶ 6.) "Having witnessed this, [Sgt. Keegan] entered D-dorm in Badin to place [Plaintiff] in restraints." (Id., ¶ 7.) "[Plaintiff] stated, 'Don't fucking touch me!'" (Id., ¶ 8.)

---

3 Under NCDPS policies, officers should use batons only when "lower levels of force[,] such as communication, pepper spray, [and] hands on physical force[,] are not feasible or failed . . . or in extreme circumstances." (Docket Entry 56 at 6 (internal quotation mark omitted).) Per policy, Officer "McConnell should have used a lower level of force, instead of the [e]xpandable baton." (Id. at 7.) As such, her "use of [the e]xpandable baton was unnecessary and [e]xcessive." (Id.)

"[Sgt. Keegan] then gave verbal commands to [Plaintiff] to place his hands behind his back and again [Plaintiff] stated, 'You better not fucking touch me!'" (Id., ¶ 9.)

"[Sgt. Keegan] took control of the arm of [Plaintiff] attempting to place hand restraints on [Plaintiff]." (Id., ¶ 10.) "[Plaintiff] resisted." (Id., ¶ 11.) "[Sgt. Keegan] placed [Plaintiff] against the wall to gain control, but [Plaintiff] turned around." (Id., ¶ 12.) "Unsure of [Plaintiff's] intentions, [Sgt. Keegan] attempted to place [Plaintiff] on the floor." (Id., ¶ 13.) "At this time, [Plaintiff] struck [Sgt. Keegan] in the mouth with his right hand." (Id., ¶ 14.) "[Sgt. Keegan] again took control of [Plaintiff] to place him on the floor." (Id., ¶ 15.) "At which point, Officer Katelyn McConnell deployed her baton using a forward strike to the left common peroneal of [Plaintiff]." (Id., ¶ 16.) "Officer McConnell was able to stop the resistance resulting in hand restraints being applied by Sergeant Keegan." (Id., ¶ 17.)

"During the above-described event, [Sgt. Keegan] perceived [Plaintiff's] refusal to follow directives and aggressive resistance, as creating a threat to staff safety and the security of the facility." (Id., ¶ 18.) "[Sgt. Keegan] only used force to prevent assault on [him]self, and other correctional staff, and to control [Plaintiff]." (Id., ¶ 19.) "[Sgt. Keegan] used only the amount of force necessary to achieve the correctional objectives of

8

preventing assault, controlling and subduing [Plaintiff], and ensuring his compliance with lawful orders." (Id., ¶ 20.) "[Sgt. Keegan] did not continue to use force once the need for force was no longer present" (id., ¶ 21), and he "did not use any force for the very purpose of causing any harm to [Plaintiff]" (id., ¶ 22).

For her part, Officer McConnell avers:

Officer McConnell has worked for the NCDPS since 2012, serving as a Correctional Officer at Albemarle on the date in question. (Docket Entry 45-6, ¶¶ 2-3.) At approximately 8:50 a.m. on February 8, 2018, "Sergeant Keegan gave a verbal directive to [Plaintiff] to move a chair away from his bunk." (Id., ¶ 5.) "[Plaintiff] returned to his block, grabbed the chair and threw it downstairs." (Id., ¶ 6.) "[Plaintiff] then ran downstairs and struck Sergeant Keegan in the head with a closed fist." (Id., ¶ 7.) "[Officer McConnell] then deployed [her] baton using a forward strike to the left common peroneal of [Plaintiff] to stop the assault on Sergeant Keegan." (Id., ¶ 8.) "Sergeant Keegan was able to gain control of [Plaintiff]." (Id., ¶ 9.) "[Plaintiff] was then placed in restraints and taken to Medical and then restrictive housing." (Id., ¶ 10.)

"During the above-described event, [Officer McConnell] perceived [Plaintiff's] refusal to follow directives and aggressive resistance, as creating a threat to staff safety and the security of the facility." (Id., ¶ 11.) "[Officer McConnell] only used

9

force to prevent assault on [her]self, and other correctional staff, and to control [Plaintiff]." (Id., ¶ 12.) "[Officer McConnell] used only the amount of force necessary to achieve the correctional objectives of preventing assault, controlling and subduing [Plaintiff], and ensuring his compliance with lawful orders." (Id., ¶ 13.) "[Officer McConnell] did not continue to use force once the need for force was no longer present" (id., ¶ 14), and she "did not use any force for the very purpose of causing any harm to [Plaintiff]" (id., ¶ 15).

Defendants also submitted surveillance video "from the time of the alleged incident." (Docket Entry 46 at 1.) Specifically, they submitted four videos: one of the Officer's Station, one of a nearby hallway, and two of the Badin Unit D dorm, taken from slightly different angles. However, "[t]he actual incident occurs outside of recorded area." (Docket Entry 45-1, ¶ 29.) In addition, the time stamps on the videos do not align. (See, e.g., Docket Entry 45-4 at 4 (noting on Incident Report that "Housing Cameras appear to show different time[] than Officer desk area and Unit Hallway").)[4] Instead, the dorm videos reflect a time approximately fourteen minutes earlier than the Officer's Station and hallway videos. Moreover, the videos occasionally experience

_____

4 Per the Incident Report, "[t]he housing unit cameras are on a different recorder than the officer desk area and unit hallway." (Id.)

glitches wherein they temporarily freeze and then jump forward by multiple seconds.[5]

Nevertheless, as relevant to the Motion, the videos reflect:

In the middle of the Officer's Station appears a desk facing a hallway between two dorms. Due to the angle of the camera, mounted on the ceiling or top of the wall in the bottom right

---

5    Per the Incident Report (see, e.g., id. at 8) and Plaintiff's recollection (see Docket Entry 51 at 4), Security Risk Group Intelligence Officer Scott Radosevic escorted Plaintiff to Restrictive Housing following the incident. (Docket Entry 45-4 at 8.) As such, Plaintiff contends that (i) the time discrepancies between the videos; (ii) the fact that the Officer's Station and hallway videos show Defendants escorting Plaintiff out of the dorm and into the hallway, where Unit Manager Rhonda Almond assumed control of Plaintiff and escorted him out of the hallway frame, rather than Officer Radosevic; and (iii) the fact that the videos do not show multiple officers "rushing/running" to respond to a Code 4 (Docket Entry 51 at 7) demonstrate that the videos "w[ere] altered and edited" (id. at 5). (See generally Docket Entry 51.) In Plaintiff's view, this editing occurred "to conceal evidence of [Sgt.] Keegan's malicious misconduct." (Id. at 10.) As a preliminary matter, the videos do show two male officers responding to the scene moments after Unit Manager Almond assumed control of Plaintiff, with the male officers appearing in the doorway between the Officer Station area and the hallway as Almond escorted Plaintiff out of the frame at the other end of the hallway. Officer McConnell gestured for those officers to follow her before she followed Almond and Plaintiff out of the frame; the video excerpts cease as those officers walk down the hallway towards the spot where Almond, Plaintiff, and Officer McConnell exited the frame. Moreover, for the reasons discussed below, none of Plaintiff's quibbles with the videos impact resolution of the Motion. In any event, Plaintiff offers only speculation, rather than evidence based on personal knowledge, regarding the alleged "editing" of the videos. (See generally Docket Entry 51.) Such speculation does not qualify as competent evidence for summary judgment purposes. See Robinson v. Fenner, No. 3:18cv117, 2021 WL 771753, at *2 (E.D. Va. Feb. 26, 2021) ("The absence of an 'affirmative showing of personal knowledge of specific facts' prevents the consideration of such facts in conducting a summary judgment analysis.").

11

corner of the room, the video shows only the entrances to the dorm to the left of the Officer's Station and hallway well. That dorm contains two sliding metal doors, each bearing a long vertical rectangular window; one of the doors appears in the main area of the Officer's Station and the other door appears roughly halfway up the visible portion of the hall. At the right side of the main area, opposite the left dorm door, the edge of the door into Plaintiff's dorm appears. Finally, the bottom right corner of the video contains part of a pathway through which one can access the unit hallway. In turn, the video footage from the unit hallway shows the portion of the hall between the overhead camera and the doorway through which one can access the Officer's Station. That doorway appears at the end of the hall opposite the hallway video camera, with multiple doors appearing on both sides of the visible length of the hall between the camera and that doorway.

For their part, the dorm videos show a room with tables and chairs in the foreground and a bunk area in the rear. The bunk area contains two levels, with a metal stairway leading up to the upper tier. The video cameras, which provide an overhead view of the dorm, provide similar vantage points into the dorm, with one camera stationed farther to the left in the dayroom area than the other camera. Neither camera shows the entrance to the Officer's Station, but the leftmost video shows more of the dorm area near the entrance to the Officer's Station.

12

Around 8:50 a.m. on February 8, 2018, the Officer's Station video shows both Defendants in the room. Officer McConnell removed from the bottom left desk drawer a to-go cup, which she placed on the desktop near where she stood beside the desk chair. Sgt. Keegan wandered around the room, drinking out of a metal travel mug, which he put down on the front of the desk as he walked past. Shortly before the door to Plaintiff's dorm opened, Sgt. Keegan retrieved his mug and stood in front of the desk facing Plaintiff's dorm door, at which point Plaintiff entered the room. As he entered, Plaintiff fiddled with his waistband area, seemingly adjusting his belt. Apparently saying something, Sgt. Keegan pointed with the hand holding his mug, prompting Plaintiff to turn and look back into the dorm before facing Sgt. Keegan again. Plaintiff and Sgt. Keegan engaged in a verbal exchange for a few seconds, during which Sgt. Keegan nodded and shook his head and occasionally pointed with the hand holding his mug, as Plaintiff grew visibly agitated. Plaintiff then strode out of the Officer's Station, returning to his dorm. Sgt. Keegan continued looking in the direction that Plaintiff departed, gesturing and nodding for a few seconds before the dorm door shut and Officer Keegan turned away. Sgt. Keegan resumed strolling around the left side of Officer's Station area, drinking his beverage. Officer McConnell remained standing behind and/or beside the desk during these events.

Meanwhile, the very bottom of the farthest left dorm video briefly shows Plaintiff, looking back towards the Officer's Station and pointing as he walked towards the right side of the dorm. Curving back towards the front of the dorm, Plaintiff temporarily exited the frame before he reappeared seconds later striding towards the stairs at the rear half of the dorm. Shortly thereafter, Plaintiff also appeared in the second dorm video. Both videos show Plaintiff walking across the dorm, up the stairs, and to a plastic chair resting near the upper railing. Plaintiff picked up the chair, looking over the railing as he raised it above his head and then dropped it over the railing. The chair hit the bottom floor and bounced towards the right side of the dorm, coming to rest behind a bunk bed. Although not visible on the rightmost video, the overturned chair appears towards the rear of the leftmost video.[6] Unlike the inmates who turned to look when the chair hit the floor, Defendants did not react in any manner that could indicate that they heard the chair hit the floor in the rear of the dorm through the closed dorm door.[7] Immediately after dropping the chair over the railing, Plaintiff strode back down the stairs and in the direction from which he originally entered,

---

6 Given the vantage point and intervening objects and people, it remains unclear whether one could see that overturned chair upon entering the dorm from the Officer's Station.

7 For example, Defendants did not look in the direction of Plaintiff's dorm until Plaintiff returned downstairs after dropping the chair.

14

exiting the dorm videos. By approximately 14 seconds[8] after Plaintiff exited the videos, inmates began retreating from the (largely off-video) area nearer the Officer's Station farther into the visible portion of the dayroom. For approximately thirty seconds, inmates gathered and looked in the direction of the Officer's Station before they dispersed.

Contemporaneously with Plaintiff reaching the bottom of the stairs, Sgt. Keegan, standing in front of the door to the dorm at the left side of the Officer's Station, turned back in the direction of the door to Plaintiff's dorm. Walking towards the desk, Sgt. Keegan took another drink of his beverage and then placed the mug on the desk before strolling towards Plaintiff's dorm door, which opened for him to pass through. As Sgt. Keegan exited, Officer McConnell opened the bottom left desk drawer. She placed both her travel cup and Sgt. Keegan's travel mug in the drawer before she walked around the left side of the desk and to the (open) door to Plaintiff's dorm. Ten seconds elapsed between Sgt. Keegan walking through the dorm door and Officer McConnell arriving at the door, where the video shows her immediately

---

8  The farthest left video, which shows portions of the dorm closer to the Officer's Station, freezes for eleven seconds two seconds after Plaintiff exited the frame. After it resumes, an inmate at the very bottom of the frame started standing up from the chair where he had been seated. As he retreated farther into the dayroom, another inmate appeared in the frame, walking backwards from the direction of the Officer's Station entrance, watching activity in that area.

assuming a bracing stance before moving back and forth. Six seconds later, she deployed the baton. The video shows only glimpses of Officer McConnell during these events, before she moved completely out of view into the dorm. Approximately twenty-six seconds later, Plaintiff, with his hands handcuffed behind his back and Sgt. Keegan holding his arm, entered the Officer's Station, followed by Sgt. Keegan and Officer McConnell. They walked through the Officer's Station and into the unit hallway, where Unit Manager Rhoda Almond assumed control of Plaintiff. Approximately twenty-five seconds after Defendants and Plaintiff exited the Officer's Station video, two male officers appeared in the hallway between the two dorms. Those officers also walked through the Officer's Station and into the unit hallway, where they followed Almond, Plaintiff, and Officer McConnell down the hallway.

## DISCUSSION

### I. Relevant Standards

### A. Summary Judgment Standards

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the

16

absence of such dispute.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party."  Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).  In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'"  Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)).  If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper."  Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

Nevertheless, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.  Moreover, "the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment."  Lewis v. Eagleton, No. 4:08-cv-2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (citing Baber v. Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992)),

17

aff'd, 404 F. App'x 740 (4th Cir. 2010); see also Pronin v. Johnson, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that "[m]ere conclusory allegations and bare denials" or the nonmoving party's "self-serving allegations unsupported by any corroborating evidence" cannot defeat summary judgment). Further, factual allegations in a complaint or other court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury. See Reeves v. Hubbard, No. 1:08cv721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011), recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011).

However, "where affidavits present conflicting versions of the facts which require credibility determinations, summary judgment cannot lie." Raynor v. Pugh, 817 F.3d 123, 130 (4th Cir. 2016) (internal quotation marks omitted). Yet, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007); see also, e.g., Love v. Beasley, 788 F. App'x 935, 937 (4th Cir. 2020) (concluding, on review of summary judgment decision, "that the district court did not err in finding that [a defendant] did not punch [the plaintiff] as alleged, because video of the incident confirms [the defendant's] denial"). Notably, though, in Scott,

the [United States] Supreme Court was faced with a videotape of the incident in question that "utterly discredited" the plaintiff's account, rendering it a "visible fiction." 550 U.S. at 380-81. As between a videotape of undisputed authenticity, *id.* at 378, and the plaintiff's story, the Court held, the videotape should prevail. Where the nonmoving plaintiff's account is "blatantly contradicted by the record" so that "no reasonable jury could believe it," it should not be adopted by a court ruling on a motion for summary judgment. *Id.* at 380.

As [the United States Court of Appeals for the Fourth Circuit] ha[s] clarified, *Scott* is the exception, not the rule. It does not "abrogate the proper summary judgment analysis, which in qualified immunity cases 'usually means adopting . . . the plaintiff's version of the facts.'" *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott*, 550 U.S. at 378). That standard continues to apply in the face of "documentary evidence" that lends support to a government official's account of events, *id.*, or even makes it "unlikely" that the plaintiff's account is true, *United States v. Hughes*, 606 F.3d 311, 319-20 (6th Cir. 2010) (holding that *Scott* does not apply to photographs rendering plaintiff's account "unlikely"). Summary judgment is proper under *Scott* only when there is evidence — like the videotape in *Scott* itself — of undisputed authenticity that shows some material element of the plaintiff's account to be "blatantly and demonstrably false." *Blaylock v. City of Phila.*, 504 F.3d 405, 414 (3d Cir. 2007) (refusing to extend *Scott* to evidence in form of police photographs that fail to depict "all of the defendant's conduct and all of the necessary context"); *see also Witt*, 633 F.3d at 277 (holding *Scott* inapplicable to soundless video that does not capture key disputed facts).

Harris v. Pittman, 927 F.3d 266, 275-76 (4th Cir. 2019) (ellipsis in original) (parallel citations omitted).

## B. Excessive Force Standards

"The Eighth Amendment protects prisoners from 'unnecessary and wanton infliction of pain.'" Thompson v. Commonwealth of Va., 878

19

F.3d 89, 97 (4th Cir. 2017) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 103 (1976)). "That protection imposes on prison officials an affirmative 'obligation to take reasonable measures to guarantee the safety of . . . inmates.'" <u>Id.</u> (ellipsis in original) (quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 320 (1986)). Accordingly, in evaluating an eighth-amendment excessive force claim, the Court "must determine 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" <u>Id.</u> at 98 (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 7 (1992)). In conducting this analysis, the Court considers "whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." <u>Iko v. Shreve</u>, 535 F.3d 225, 238 (4th Cir. 2008) (internal quotation marks omitted).

Notably, a prisoner need not suffer a significant injury to prevail on an excessive force claim. <u>See</u> <u>Thompson</u>, 878 F.3d at 98; <u>see also</u> <u>Hudson</u>, 503 U.S. at 9 ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident." (citation omitted) (citing <u>Whitley</u>, 475 U.S. at 327)). "The excessive force analysis thus focuses on the maliciousness of the force used, not the severity of the injury that results from that force." <u>Thompson</u>, 878 F.3d at 101; <u>see</u>

20

also Wilkins v. Gaddy, 559 U.S. 34, 38 (2010) ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."). As the Fourth Circuit recently explained:

> Although [courts] once considered the severity of an inmate's *injuries* under the objective component, the Supreme Court has clarified that what matters is the severity of the *force* employed. So long as the force used is more than de minimis, the objective component is satisfied, regardless of the extent of the injury.

Dean v. Jones, 984 F.3d 295, 303 (4th Cir. 2021) (emphasis in original) (citation omitted).

As for the subjective component, "[t]he state of mind required in excessive force claims is 'wantonness in the infliction of pain.'" Iko, 535 F.3d at 239 (quoting Whitley, 475 U.S. at 322); see also id. ("Put differently, the 'core judicial inquiry' regarding the subjective component of an excessive force claim is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" (quoting Hudson, 503 U.S. at 7)). The Supreme Court has identified four factors to assist courts in determining whether an officer acted with "'wantonness'":

> (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) "any efforts made to temper the severity of a forceful response."

21

Id. (quoting Whitley, 475 U.S. at 321). "From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." Whitley, 475 U.S. at 321.

"In considering the reasonableness of an officer's actions, [the court] must consider the facts at the moment that the challenged force was employed." Smith v. Ray, 781 F.3d 95, 101 (4th Cir. 2015). Notably, a plaintiff's failure to obey a direct order does not justify a defendant's subsequent use of "gratuitous or excessive force against [him]." Corselli v. Coughlin, 842 F.2d 23, 27 (2d Cir. 1988); see also, e.g., Saunders v. Duke, 766 F.3d 1262, 1269 (11th Cir. 2014) (explaining that, "even if the complaint could be read to allege that [the plaintiff] disobeyed an order . . ., that minor transgression does not mean that the force allegedly used was a constitutionally permissible response"); Miller, 913 F.2d at 1088-89 (vacating grant of summary judgment to prison guard even though inmate plaintiff turned in doorway towards and insulted guard rather than obeying order to go through doorway, noting that "[the plaintiff's] version of the incident supports a reasonable inference that [the defendant] intended to provoke an incident so as to allow [the defendant] to beat [the plaintiff] under the guise of maintaining order or defending himself").

## II. Analysis

Defendants seek summary judgment on the grounds that "[t]he record evidence, even when viewed in a light most favorable to Plaintiff, does not support the subjective component of an excessive force claim." (Docket Entry 43 at 7.)[9] According to Defendants:

> the record evidence demonstrates that the need for Defendants' use of hands-on physical force arose when Plaintiff refused [a] direct order to place his hands behind his back and when Plaintiff struck [Sgt.] Keegan in the mouth after refusing said direct order. (Keegan Aff. ¶¶ 9-14; McConnell Aff. ¶¶ 7-9). Moreover, the summary judgment evidence indicates that Defendants perceived Plaintiff's refusal to follow directives and aggressive resistance, as creating a threat to staff safety and the security of the facility and only used as much force as was necessary to prevent imminent assault and regain control of Plaintiff. (Keegan Aff. ¶¶ 18-20; McConnell Aff. ¶¶ 11-13)[.] On this record, Plaintiff cannot present any credible evidence upon which a reasonable jury could find that Defendants used force, sadistically and maliciously, for the very purpose of inflicting pain or injury. Therefore, there are no genuine issues as to any material fact and Defendants are entitled to judgment as a matter of law.

(Docket Entry 43 at 6.)[10]

---

9 As relevant here, Defendants do not assert that Sgt. Keegan applied only de minimis force in his encounter with Plaintiff. (See id. at 6-10.) In any event, Plaintiff averred that Sgt. Keegan applied sufficient force to Plaintiff's throat/windpipe to "slam[]" him into a wall (Docket Entry 2 at 22), establishing that Sgt. Keegan applied more than de minimis force.

10 Defendants also seek summary judgment on any official-capacity claims that Plaintiff pursues against them. (See id. at 10.) It remains unclear whether Plaintiff pursues official-capacity claims against Defendants. (Compare Docket Entry 2 at 3 (marking both official capacity and individual capacity for Defendants), with id. at 37 (seeking monetary damages from

23

## A. Sgt. Keegan

Contrary to Defendants' contentions, when viewing the record in the light most favorable to Plaintiff, a material factual dispute exists regarding whether Sgt. Keegan applied only the amount of force necessary to obtain control of Plaintiff when Plaintiff attempted to walk past Sgt. Keegan after his tacit order to submit to handcuffs[11] (see, e.g., Docket Entry 2 at 22 (averring that Sgt. Keegan grabbed Plaintiff by the throat and aggressively slammed him into a nearby wall after expressing desire to use force against him); Docket Entry 55 at 7 (averring that Sgt. Keegan applied "pressure/force" to Plaintiff's throat/windpipe "to ram/rush Plaintiff into the nearby wall")). See Miller, 913 F.2d at 1088-89 (overturning summary judgment award where "[the

_____

Defendants solely "in [their] individual capacity").)  In any event, Plaintiff seeks only monetary relief for Defendants' alleged excessive force.  (See id. at 37.)  Defendants contend that the Eleventh Amendment bars such claims.  (See Docket Entry 43 at 10.) Section 1983 does not permit damages suits against state personnel acting in their official capacity.  See Will v. Michigan Dep't of State Police, 491 U.S. 58, 70-71 (1989).  Accordingly, the Court should grant Defendants' request for summary judgment on Plaintiff's official-capacity claims, if any.

11  Plaintiff insists that Sgt. Keegan never ordered him to submit to handcuffs.  (See, e.g., Docket Entry 2 at 25.)  However, Plaintiff reports that, when he met Sgt. Keegan in the middle of the dorm, Sgt. "Keegan held a pair of handcuffs in his hand" and told Plaintiff, "'I hope you refuse to cuff up so I can make you!'" (Id. at 22.)  Although Sgt. Keegan did not answer Plaintiff's subsequent question as to whether that statement "[wa]s an order or a challenge'" (id.), the circumstances establish that it constituted an order to submit to handcuffs (albeit unprofessionally phrased).

plaintiff's] version of the incident supports a reasonable inference that [the defendant] intended to provoke an incident so as to allow [the defendant] to beat [the plaintiff] under the guise of maintaining order or defending himself"); Hicks v. Sadie, No. 1:19cv115, 2022 WL 2952507, at *21 (M.D.N.C. July 26, 2022) (finding material factual dispute as to whether officer "applied only the force necessary to maintain control of [the p]laintiff" where officer "made comments evidencing intent to retaliate while applying pressure to [the p]laintiff's handcuffed arms").[12]

Consideration of the Whitley factors does not alter this conclusion. As to the first factor, "the need for the application of force," Iko, 535 F.3d at 239 (internal quotation marks omitted), construed in the light most favorable to Plaintiff, the record reflects that, immediately after grabbing and pushing on Plaintiff's arm as he attempted to walk past (see Docket Entry 2 at 22), Sgt. Keegan grabbed Plaintiff by the throat/windpipe and used that grip to "ram" Plaintiff into the wall (Docket Entry 55 at 7),

---

12 Because a material factual dispute regarding Sgt. Keegan's initial actions precludes summary judgment in his favor, the Court need not separately analyze whether Sgt. Keegan's and Plaintiff's subsequent interactions independently require denial of the Motion. See Miller, 913 F.2d at 1088-89 (vacating summary judgment against the plaintiff on excessive force claim even though, during incident, the plaintiff turned to face officer, who raised baton, whereupon the plaintiff raised his handcuffed hands and, in response to officer's subsequent blows and threats, allegedly "reacted by pushing the officer away and picking up a broom handle to protect himself" before additional officers helped subdue the plaintiff).

"aggressively . . . . attempting to bang Plaintiff's head into the wall" (Docket Entry 2 at 22). Although Plaintiff's noncompliance may have warranted some use of force,[13] Plaintiff avers that he "had shown no signs of an assault or attempted assault on [Sgt.] Keegan." (Id. at 23.) Accordingly, this factor only slightly favors Sgt. Keegan's position. See, e.g., Smith v. Management & Training Corp., No. 3:17-cv-629, 2019 WL 4658365, at *4 (S.D. Miss. Sept. 24, 2019) (denying summary judgment on excessive force claim where inmate disobeyed order, but parties "disagree[d] as to the degree of force [the officer] used," explaining that, "[w]hile [the officer] contends that he only used the force necessary to subdue [the plaintiff] (what he describes as a 'soft empty hands technique'), [the inmate] contends that [the officer] threw him down and choked him").

The second factor, "the relationship between the need and the amount of force that was used," Iko, 535 F.3d at 239 (internal quotation marks omitted), supports denial of summary judgment. Here, Plaintiff asserts that Sgt. Keegan grabbed him around the throat, "ram[ming]" (Docket Entry 55 at 7) and "slam[ming]" him into the wall (Docket Entry 2 at 22). This evidence (if believed)

---

13 In arguing for summary judgment on Sgt. Keegan's behalf, Defendants rely solely on Plaintiff's failure to comply with Sgt. Keegan's order to submit to handcuffs. (See, e.g., Docket Entry 43 at 6-7.) However, consideration of Plaintiff's response to Sgt. Keegan's directive to move the chair does not alter this analysis.

"tend[s] to show that the amount of force used was disproportionate to the need for force." Iko, 535 F.3d at 240.

The remaining factors, "the extent of any reasonably perceived threat that the application of force was intended to quell" and "any efforts made to temper the severity of a forceful response," id. at 239 (internal quotation marks omitted), also tilt against summary judgment. Plaintiff's evidence indicates that, after expressing a desire to "'make'" Plaintiff submit to handcuffs, Sgt. Keegan grabbed Plaintiff by the throat as Plaintiff walked past Sgt. Keegan and, using that grip, slammed him into a wall. (Docket Entry 2 at 22.) Before gripping Plaintiff by the throat, Sgt. Keegan had taken possession of Plaintiff's arm, but instead of using that grip to ensure Plaintiff's compliance with the (indirect and provocative) order to submit to handcuffs, Sgt. Keegan instead escalated his use of force against Plaintiff, who "had shown no signs of an assault or attempted assault on [Sgt.] Keegan" (id. at 23). (See id. at 22-23.)

"All told," at this juncture in the proceedings, "these factors combine to provide an inference that [Sgt. Keegan] wantonly inflicted pain upon [Plaintiff by grabbing him by the throat and slamming him against the wall]." Iko, 535 F.3d at 240; accord, e.g., Miller, 913 F.2d at 1088-89; Corselli, 842 F.2d at 26-27; see also Sidney v. Wilson, No. 03 Civ. 0830, 2007 WL 4208626, at *5-6 (S.D.N.Y. Nov. 21, 2007) (denying summary judgment notwithstanding

27

inmate's admitted failure to comply with order where inmate asserted that he "never physically threatened" officer, who allegedly threw him to ground, pinned his head to floor, and kicked him).

Sgt. Keegan contends, however, that qualified immunity shields him from Plaintiff's excessive force claim. (See Docket Entry 43 at 10-11.) Specifically, Sgt. Keegan asserts:

> Even if Plaintiff could establish a constitutional violation, which Defendants assert he cannot, Defendants would nonetheless be entitled to qualified immunity. The record evidence establishes that Defendants only used [sic] Defendants' use of hands-on physical force arose when Plaintiff refused [a] direct order to place his hands behind his back and when Plaintiff struck [Sgt.] Keegan in the mouth after refusing said direct order. (Keegan Aff. ¶¶ 9-14; McConnell Aff. ¶¶ 7-9).[14] Accordingly, on this evidence, no reasonable fact finder could find that a reasonable correctional officer in Defendants' position should have known that their conduct would constitute excessive force. Thus, the conduct of Defendants did violate [sic] a clearly established constitutional right of Plaintiff. Therefore, there are no genuine issues as to any material fact and Defendants are entitled to judgment as a matter of law.

(Docket Entry 43 at 11.)

The Court applies a two-step analysis to qualified immunity defenses, asking "whether the facts alleged or shown, taken in the

_____

14  To the extent that Defendants do not confine their latter assertion to Officer McConnell's actions (compare Docket Entry 45-5, ¶¶ 9-16 (acknowledging that Sgt. Keegan utilized force against Plaintiff prior to Plaintiff's punch), with Docket Entry 45-6, ¶¶ 5-9 (lacking description of Sgt. Keegan's physical actions prior to Plaintiff's punch and Officer McConnell's baton deployment)), it bears noting that Plaintiff avers that Sgt. Keegan utilized force against him prior to Plaintiff punching Sgt. Keegan (see, e.g., Docket Entry 2 at 22-24).

28

light most favorable to the plaintiff, establish that the [correctional] officer's actions violated a constitutional right" and "whether the right at issue was 'clearly established' at the time of the officer's conduct." Harris, 927 F.3d at 279 (certain internal quotation marks omitted). "The plaintiff bears the burden of proof on the first question — *i.e.*, whether a constitutional violation occurred [— and t]he defendant bears the burden of proof on the second question — *i.e.*, entitlement to qualified immunity." Henry v. Purnell, 501 F.3d 374, 377-78 (4th Cir. 2007) (citations omitted). For the reasons stated above, the facts, construed in the light most favorable to Plaintiff, would support a finding that Sgt. Keegan violated Plaintiff's eighth-amendment rights. Moreover, courts have long held that officers cannot use "gratuitous or excessive force against" inmates who fail to comply with their orders. Corselli, 842 F.2d at 27; see also Miller, 913 F.2d at 1088-89. Notwithstanding that authority, Defendants' brief in support of the Motion "contains no citation to cases actually applying the 'clearly established' prong of the qualified immunity test," Hensley on behalf of N.C. v. Price, 876 F.3d 573, 581 n.5 (4th Cir. 2017), in relevant circumstances. As such, Sgt. Keegan has failed to establish his "entitlement to qualified immunity," Henry, 501 F.3d at 378, at this stage of the proceedings.

**B. Officer McConnell**

As for Officer McConnell, the evidence, viewed in the light most favorable to Plaintiff, reflects that, after Plaintiff punched Sgt. Keegan, Officer McConnell hit Plaintiff in the leg with her baton while yelling "'stop!'" (Docket Entry 2 at 24; see id. at 23-24.) Notably, per Plaintiff, Officer McConnell "did not hit Plaintiff hard at all." (Docket Entry 55 at 13.) Thus, the record establishes that Officer McConnell intervened, with a verbal command and a "not . . . hard" hit to Plaintiff's leg, to stop Plaintiff, who had just punched another officer. Under such circumstances, all four Whitley factors weigh in Officer McConnell's favor. The Court should therefore grant Officer McConnell's request for summary judgment on Plaintiff's excessive force claim.[15]

---

15 To the extent Plaintiff seeks to assert a failure-to-intervene claim against Officer McConnell (see, e.g., Docket Entry 2 at 24 ("[Officer McConnell failed to] intervene[] to preserve/provide security to Plaintiff, while Plaintiff was under attack")), such claim fails. An officer who "(1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act, . . . may be deemed an accomplice and treated accordingly." Randall v. Prince George's Cnty., 302 F.3d 188, 203 (4th Cir. 2002). Plaintiff maintains that Officer McConnell "watched the entire incident [between Sgt. Keegan and Plaintiff] from the entrance of the dorm" but did not intervene until Plaintiff punched Sgt. Keegan. (Docket Entry 2 at 24.) However, the video — in a section not challenged by Plaintiff (see generally Docket Entry 51) — establishes that Officer McConnell did not passively watch the entire altercation between Sgt. Keegan and Plaintiff from the dorm doorway. Rather, upon reaching the dorm doorway ten seconds after Sgt. Keegan departed the Officer's Station, Officer McConnell immediately physically engaged with the altercation, deploying her baton a mere six seconds after her

**CONCLUSION**

Plaintiff cannot pursue a claim for damages against Defendants in their official capacity under Section 1983, and the record does not support an excessive force claim against Officer McConnell. However, material factual disputes preclude summary judgment on Plaintiff's excessive force claim against Sgt. Keegan.

**IT IS THEREFORE RECOMMENDED** that the Motion (Docket Entry 42) be granted in part and denied in part as follows: summary judgment should be entered on Plaintiff's official capacity claims, if any, and his individual-capacity claim against Officer McConnell, but

---

arrival at the dorm doorway. Accordingly, on the current record, no reasonable jury could find that Officer McConnell possessed a reasonable opportunity to intervene to stop Sgt. Keegan's actions against Plaintiff. See, e.g., O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d Cir. 1988) ("Even when the evidence is viewed in the light most favorable to the plaintiff, there is insufficient evidence to permit a jury reasonably to conclude that [the officer's] failure to intercede was a proximate cause of the beating. The three blows were struck in such rapid succession that [the officer] had no realistic opportunity to attempt to prevent them. This was not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator."); Kelly v. Solomon, No. 3:17-cv-311, 2020 WL 247539, at *2 (W.D.N.C. Jan. 15, 2020) (rejecting failure to intervene claim against officer Ingram where another officer's "alleged strike to [the p]laintiff's head . . . would have been quick and Ingram would not have had a reasonable opportunity to intervene").

summary judgment should be denied on Plaintiff's individual-capacity excessive force claim against Sgt. Keegan.

This 16th day of August, 2022.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**
